Case 24-1269 Tyler McClain v. Nick Tuttle et al. Tom Kicklack v. Brent Smith v. McClain Jonathan Outhouse v. Nick Tuttle Is that a fair statement for Tuttle? There was more analysis here of the use of the taser, wasn't there? I'm wondering if the answer to your complaint, the resolution of your complaint, is different for your different officers. I believe that each officer is entitled to that analysis. We could say that in the district court's opinion there is a specific mention of Tuttle because there is. And a focus on the taser and the suggestion, basically. Well, the other conduct was equivalent to the use of the taser. So the other two maybe got rolled into the use of the taser, which I think was Tuttle. Is that correct? Tuttle did apply a drive-stun. Yes, Judge. And if we could begin with that analysis, I'm very happy to do so because of that concept of all of the conduct that happened before the use of the taser was equal to a tasing. For one thing, it ignores that, as this court points out, there's a difference between using a taser and applying a drive-stun. A drive-stun, if we can call what happened here, which was simply the application of the electrodes on the taser, if you remove the cartridge, doesn't incapacitate a person. It does impose pain. That's what it's meant to do in order to get compliance. And that's exactly what it did in this case. And if you think about the video here, another one of the most important points is that we don't need to argue about the facts. The facts are all for the court to see. And I'm sure the court has viewed the video and has seen that when Officer Tuttle applied the taser to the thigh of the plaintiff, that was after he had asked over 25 times, please get in the car, please sit in the car, sit in the car. And it's very, very clear law in the Eighth Circuit and I think in the United States that when faced with noncompliance, as this court has written in Ehlers and, of course, this court just recently wrote in Cartier, when faced with noncompliance, an officer is entitled to use some force to gain compliance. And there is simply, it is impossible to argue that the officers in this case, all three of them, but especially Tuttle in this case where he applied the drive-stunt, wasn't faced with noncompliance. He was faced with the very definition of noncompliance. Yes, sir. Counsel, I'd like to go back, if we could, to the sufficiency of the individualized analysis of each officer. You're certainly correct that the court's required to have a clear analysis of each officer and their alleged conduct. I think the district court made our job unnecessarily difficult by the way the order was written. If you look at the court's discussion section, you're absolutely correct. There's not an individualized analysis. But it seems to me if you look at the order as a whole, I went through it, and I was able to find very clearly what each officer is alleged to have done. And I can read each officer and what the court said about each one of them. Why is that not a sufficient individualized analysis? Well, there's two reasons. The first one is, again, there's a videotape. And the videotape, as I think the Supreme Court and Scott B. Harris instructed us, is what must be used by the court when the court has a videotape. And I think they put it something like, as opposed to visible fiction, one must use and watch and apply, take the facts as true of the videotape. That doesn't happen in the district court's opinion. But secondly, if the analysis that you mentioned, each officer has mentioned, if you did look at the videotape and compared it to the district court's opinion, it's wrong that simply what is assigned to each officer is not what they actually did. For instance, you have in, I believe, the district court opinion, Officer Smith, Brent Smith, lifting the arms of the plaintiff and I think walking her up to the cars across the pasture and up the hill. Yeah, it was actually Tuttle and Outhouse that did it. It's Tuttle and Outhouse. Smith didn't do that. In fact, the reason we know it happened is because it's Smith's body-worn camera, that you can see that most clearly because he is walking alongside. Do you think that's material to the sufficiency of the qualified immunity analysis? Because the court also then gives some pretty detailed analysis to each individual officer in addition to that. Your Honor, I do think it's material. I think it's material because, again, when we're conducting a qualified analysis, it's absolutely vital that the actual actions of that officer are analyzed in light of the circumstances surrounding those actions. And so I think if we read very carefully the district court opinion, we cannot find a careful analysis of the actions of each officer in the circumstances as reflected in the video, as you can actually see and we can actually ascertain from the video. So are you asking us to remand the case for a more thorough analysis? I don't believe that's necessary. I'm not asking for that, Justice Garza. I won't refuse it if that's all that's available to me, but I'm not asking for that. What I'm asking for is to apply this court's case law, again, in the most recent case, and we have a very simple situation, and that is from the very get-go, this case was about the plaintiff refusing to obey commands, refusing to comply, refusing to cooperate. Let's go ahead and dig into the merits a little bit more. What crime did Deputy Smith have probable cause to believe that this injured accident victim had committed when he pulled her out of her vehicle and pinned her down to the ground? Your Honor, not that we need a crime in that situation. Well, he seized her from her car, drug her out, pinned her down to the ground face down. You're saying that he can do that if there's no probable cause? I am saying that in this case, in this court's jurisprudence, I want to think about Ehlers, where the subject is walking away from an officer who is saying, put your hands behind your back, put your hands behind your back. She's not walking away. She's an injured accident victim sitting in her own car, obviously confused and dazed trying to shove the airbag back into the steering wheel. And being told, stop, get out of the car, what are you doing, stop, get out of the car, repeatedly. What was she suspected of doing? Pardon? What was she suspected of doing? What probable cause was there for seizing her and pinning her to the ground? There is probable cause for, as the court I think mentions, the district court mentions, for obstruction, for obstruction with governmental operations. Well, with the instructions to stop and don't try to drive the car. What crime is she suspected of having committed? She had just started the car, just before Officer Smith arrived at the door, she had started the car. His training officer, or his trained officer, he was a training officer, called him down for help because she had started the car. And so we know that she's trying to drive against the instructions of the officer, you don't know who's behind you, it's dark, your car is wrecked, and clearly you're in no shape to drive. So stop what you're doing and get out. Was the car operable? She also tried to pick up the bumper and put it back on the car. She did. She's clearly injured and confused. She is. There's no doubt that she is. And, in fact, I think the district court, when it said, I think the district court ruled that the elements of that crime, that obstruction of crime, were there. I think the district court went through those elements. And yet what the district court said was something that doesn't appear in any jurisprudence in qualified immunity. They said she didn't have the mens rea. She didn't have the ability that a jury might find out, might decide. She didn't have the ability to decide to break a law. But that's not within the qualified immunity analysis. What the officer is entitled to do is observe what's happening in front of them and act accordingly. And that's what the officer did. As I understand your position, you're asking us to take a look at the video ourselves and award your clients qualified immunity based on the video. Is that a fair summary? I mean, you may be asking other things as well. Well, the video is there for the court to see. And the cases are very clear that when you have one, you use one. What we do, like the district court, we don't have jurisdiction to review the district court's factual findings. And I think the factual findings here are a little bit odd. Because the district court said, look, a reasonable jury could find the following. And the key finding that was embedded in that, I think, is that she was not being noncompliant because of her illness. And that a jury could find that she was not, that a reasonable officer would not have found her to be noncompliant. How do we get around that? Because, I mean, generally, if a district court finds a factual dispute, I understand under Harris we can say the video clearly says to the contrary. And that may be your position. But that seems like a closer call than the sort of thing that might go to a jury. Right? In other words, how do you view her conduct? Was she noncompliant? Or did the officers know that she was just unable to comply? Well, what the officers knew, of course, in the use of force, we must use an objective standard. And it's not so much, we cannot say what the officers knew. We can only look at the circumstances. Well, but a reasonable officer in that situation, and all the things the officers knew there, I mean, the officers arrived on the scene and the EMTs or the first responders said, she's got a medical situation that probably caused the accident. And that seemed to be the assumption that all three officers were working under. Right? They were like, they were not looking to arrest her initially. They were trying to get her home safely. I couldn't agree more, Your Honor. That's exactly what Brent Smith, what Jonathan Outhouse, Nick Tuttle were all doing. And you're right. They clearly had to be confused at the way she was acting, at the reaction to commands. Or frustrated at some point. And that's a great question. Or a jury, right? Well, I urge you to listen to the entire video. I have. What you will hear is, and you must have heard, Brent Smith speaking perfectly evenly. He did not raise his voice not one time. He attempted to reason. He attempted to apply any kind of questioning, pleading, anything he could do to get Ms. McClain to please comply. What about tasing an accident victim who is confused? Well, when we're at the car, and that's where the tasing, and we're on a busy highway, we need to get her into the car. She refuses 25 times. You know, I get what you're saying. But the reality here is that we have, in this case, that we don't in many others, is these officers were disciplined for their conduct, right? So I understand that they were initially trying to move her. But at some point, the situation and the facts changed, don't you think? I mean, at least that's what the district court found. Well, I believe what the district court did is more report their characterization of what's in the video, their reaction to what was in the video, as opposed to simply reporting what the video portrayed. And if you do that, you have the very simple situation of police officers faced with whether the person is, as in our case, is a diabetic in the Eighth Circuit, someone whose blood sugar is so low they don't know where they are. In each of these cases, we were able to find qualified immunity for the officers because they're reacting to a situation of noncompliance. And I think those cases make that clear. And I think, again, most recently Cartier. But with regard to people who have low blood sugar, we had not just Eilers, but I want to say Shettle versus Jefferson County and Crosshart, where there are people who, we all agree, didn't really know what they were doing, and yet the officers received qualified immunity for applying the force they needed to to gain control of the situation. I'd like to try to retain this rebuttal. Thank you. I'll give you a little bit more time as well. Thank you very much, Judge. Ms. Curry. Thank you. May it please the Court, Ayanna Curry for Plaintiff Kyler McClain. I feel like this panel has already really hit on the main issue, is that you don't have jurisdiction over this matter. We are talking about material fact questions. But we have a video. We have a video. And I'm trying to figure out what the district court's factual musings or conclusions or findings really are here. Your colleague has suggested it was really a gloss, I'm not quoting him directly, but the district court's kind of gloss on the facts. I mean, the video has the facts, with the possible exception of capturing the kicking, which I don't think is, you know, the officers talk about their allegations that she was kicking or was going to kick him. I don't remember seeing that. But the rest of it, we seem to see everything that happened. And the district court kind of draws conclusions based on that. What do we do with that? I think you crystallized it perfectly well. Like, there's a discrete material fact question about whether she kicked, right? When the video's going on, her body doesn't even move like she's kicking. Which might be relevant for one officer, but we don't have separate analyses here. We just have everyone thrown together. The other material fact question, as you pointed out, is, I didn't even count how many times, but the district court says she's out of it. She's out of it. She's out of it. They even notice it, how she has swerved off the road, gone down a ravine, hit a tree, backed up, and is now entangled in a fence. The car is inoperable. And what's more, Officer Outhouse takes the key. Once he does start the car, he takes the key out of the ignition. That threat is over. Which way does all of the out of it cut? Because I can see it cut both ways, which is, if they know she's out of it, that makes the noncompliance more dangerous on a busy highway, right? I mean, the fact of the matter is, if they can't get her in the car, she could run out into traffic. Somebody else could swerve and hit a tree. I don't know how busy the street was, but I'm just wondering. It's 2 o'clock in the morning. So maybe that's not such a big deal. Not busy at all. But it is dark. And it's dark. And so I'm just trying to figure out which way that cuts, because it's one thing to try to reason with someone who's lucid. It's another thing to try to reason with someone. I've seen people have diabetic attacks and things like that. You can't reason with them. And so I wonder at what point the officers just have to say, you know what, this stinks. But we're going to have to take control of this situation, because it could be dangerous. Except I don't see the danger at all. And I don't. And it's in no analog to what Tyler's going through in any of the cases that are cited. In the Eller's case, that's at a hockey game. It's a whole family, like three kids, mom, dad. Mom is the one that got kicked out of the hockey game for fighting. Then the kids jump in it. And then dad jumps in it. Or surrounded by people, yes, control that situation, because nobody's being obedient. And Scottle, he was also having, I think, probably a diabetic coma, but he was in an operable car on the side of the road where he could actually make some damage. Would you agree that some force might be reasonable? Perhaps they'd pick her up and gently set her in the car rather than tasing her? If she's disabled, I'm unable to get in? Right. I'm leaving the tasing apart for a second. But my only point here is I think there was – they could have reasonably perceived danger. They could have said if she hops out on the highway, right, she shouldn't be driving. She was shackled. Later she was. But when she was in the car, she wasn't shackled at the time she was in the car. No, no, no. I'm sorry. Back in the car. Yeah, but early on that could have been an issue. She also, once she was shackled, I don't think she had leg irons on. She could have run out. I mean, somebody who's having a diabetic attack, I've, again, seen those. They could run out in the middle of the street. And, again, maybe there's not traffic coming, but, you know, there's always the possibility somebody's out driving at 2 o'clock in the morning. Yeah, but qualified immunity doesn't cover every possibility. We're objectively looking at what's in front of you, right? She was stumbling. She could barely walk. You know, we characterize it as dragged her from her car to the patrol car. But she was handcuffed behind her back and Tuttle, and I do agree, it was Tuttle and Outhouse who dragged her. That's a simple correction. That's a motion for reconsideration, Your Honor, like some kind of errata. That's not an appeal to try to claim qualified immunity. That's an aside. But, basically, had her head down. Like, it's insane. Wasn't there some concern about spitting from the officers? It's been a week or so since I've watched the video. I mean, isn't that a reasonable, keep her head down so that the officers aren't insulted on the way? They were behind. The spitting, you know, allegation was at the car. She was, no. This was, right, this occurred over 30 minutes, like what you're talking about, and past what I'm talking about, dragging her up. That was so seven minutes ago, if you would, like, you know, at the beginning of the encounter. My only point on all of this is from a reasonable officer's point of view, because I'm putting myself in their, I mean, I don't have their training, but I'm putting myself in their shoes. And if you ask somebody 25 times, or however many it was on the video, and it's clear they're not responding, and it's clear that, you know, they could do something unpredictable, and they're not complying, then at some point you can use some physical force. I think that's pretty clear, even if somebody's out of it, and maybe particularly if somebody's out of it. Tasing, totally different matter. We'll talk about that. But what's wrong with that analysis? That's exactly what qualified immunity is for. Maybe they made the wrong choice. Maybe if they would have just left her out there and just sat there for an hour and watched her kind of do her thing and hoped she didn't run out in the middle of the street or whatever, that might have been better. Or maybe she would have been compliant, and she would have gotten in the car eventually after the 25 times. I have no idea. But my point is that seems like a pretty good case for qualified immunity. My problem with that is that they did taser. Yeah, and the taser is separate, but I'm talking about everything else. I'm talking about everything that went up to the taser. If everything else that went up to the tasing, we're agreeing that drive-stun is de minimis force. I've never been drive-stunned, and I don't want to. I think it's quite painful. But I will accept that this circuit and many others call it de minimis force. The other shows of force were, as the district court said, equal, and that they were equally de minimis. There was no striking. There was no punching or use of the baton, like the things that are more escalated uses of force. These were equally situated uses of force, and all of them on a woman who is experiencing a medical emergency with her low blood sugar. Who do you think the officers should have done?  Been more patient. That was a long video. I would rather the state of Arkansas paying those officers overtime than for them to be paying for this here. They had a problem in front of them. They had a woman who was in a medical situation who was on an active roadway, who was down in the ditch. I mean, the officers were talking about, hey, can we get a car down here? We can't do that. Do we have to cut the fence? There's no other way. We've got to cut a fence. I mean, they were dealing with a difficult situation. In that context, your answer is they should have just waited and continued? It's not a part of this appeal, but we do have a police practices expert who gives the opinion on what the industry standards are. So that's your position, they should have continued to wait until she came out of her medical condition or until they figured. Why didn't they seek medical help for her? That seems to be the obvious answer. I have lots of questions watching that video myself, how it is that she's able to, if everybody agrees that she's not in her right mind, how she's able to just dismiss all the help that they're trying to give her. I have that same question. The paramedics are the ones that found her. Then they got to leave, and then they were called back. Then she's taken to the hospital. Well, didn't she deny treatment at some point? Exactly. I guess the question is, was she in any condition to do that? Exactly, which is what the district court points out. But that's also a relevant consideration for the cops too. They knew that medical personnel had already attended to her. And, again, as you mentioned, they left. They did call them back. But they could assume that even though she was dazed and confused, that there was nothing further that perhaps the paramedics could do. I don't know. It's a tough case. Right. Except for, right, it's a tough situation. What I think the district court sees is that it was not aided by the constitutional violations that were heaped on her. The answer is not to hurt her so that she wasn't even, in addition to all the hurt she caused herself by being in the accident. I wanted to get to some other points that were brought up. I feel like Scott is overstated here, that you used the video. In Scott, that was a high-speed chase where the plaintiff was saying, oh, I didn't run any green light, any red lights. Nobody was around. We can look at the video to see whether the actual findings of the district court are clearly contradicted, can't we? Right. But the video tells the story and the district court details the story that you see in the video. The district court's point is that you can look at this video and come to different conclusions. In that case, the video confirms and corroborates what the court is saying, is that this is a jury question on what we're looking at. There's no visible fiction. You either look at that video and you see a shuttle situation of this vituperous, and it's not even shuttle. It's hard for me to even go there because that man was punching and kicking the officers. I think you had to show that the rights that you allege were violated were clearly established. Is that correct? Can you explain to me what case or cases you would point us to to say, look, we've seen the video. Assuming we get over the jurisdictional issue and we're going to take a look at clearly established, what case applies to the facts in this case that you would say, that's it, clearly established, if we get to that point? I think the district court points to Brown versus Golden. That is pretty much on point. If you see a woman, she was in the car. She was the passenger. That's similar to Tyler in that there's a car involved, but she can't cause any harm with the car, with it being inoperable. That woman called 911 because she was terrified at how the officers were behaving toward her husband. The officer told her, put that phone down, and she didn't. Correct me if I'm wrong. Brown refers to a taser here. We have the use of a taser, but not tasing. Does that make a difference for your analysis? I thought she was drive-stunned. Was it the same? It may be. I haven't read that. Then we also have to rely on the district court's kind of saying the other use of force here, the dragging, the restraining, the holding her down in the mud, that was equivalent. You're saying Brown covers that. Once the district court says the other use of force was equivalent to the use of the taser in this case, you think Brown clearly establishes the whole thing, or do we have to go use of force by use of force by clearly established law? That's a good question. Yes, I appreciated the way the court did the analysis. I do think if we're talking about de minimis force and then once you use of force after she was handcuffed, this court and Cartia just reaffirmed any more violence after that is a constitutional violation and they're not entitled to. However, if you do still, because we provide the analysis that I think the officers are claiming they're entitled to, that court can easily do this with the cases. On Cartia, the only thing, because I was the author of it, the only thing that we actually said they weren't entitled to qualified immunity was gratuitous stuff, like banging somebody's head against the door frame. I can't remember. There were some other examples as well. What here do you think was totally gratuitous? That served no purpose whatsoever. That was basically like what you see in the movies. You're just trying to punish the person. Do you think that there's something analogous here? I don't think he had any business pulling her out of the car and then putting her prone and mashing her face into the dirt, handcuffing her, then shackling her, dragging her the way that they did. She was on her tiptoes. She shackled. Her head is forward. They're pushing her head down. Her arms are, I can't even mimic it, her arms are above her head. They do that for several yards, and then drag stunt tase her, all because she was disoriented from this car wreck. I did have a hard time. Any reasonable officer would know that that level of force was unreasonable in this situation? Absolutely. I think there's law and then there's logic. So I think your authorities provide the framework when it's gratuitous and completely unnecessary, then if all else fails, then there's the hope v. Peltzer. There are some things that just, yeah, it's hard to find a case when it is just so ridiculous and so obvious, and this court is well within its power to. Your time has expired. Thank you. Mr. Kickback, you have your, let's give you two minutes. Thank you, sir. Let's start right there. There is no case that tells this court that it should deny qualified immunity when a subject is noncompliant, regardless of why, regardless of whether they are in a diabetic state, whether their blood sugar is so low they appear drunk, or regardless of whether they have good intentions as a carpenter, they're sitting on their hands and a tase was applied, regardless of whether they even know they were warned, as in Ehlers. There's no case that tells these officers, you should be on notice that what you're about to do, whether it's applying a drive-stun after someone simply will not comply with the very simple order, sit in the car over 25 times. And they did lift her. They did lift her and put her in the car. They lifted her, put her in. She would not sit. She remained in a prone position, which we know is dangerous. Well, I mean, you could take a look at the video and say she couldn't either because at that point she was pretty shackled up, right? I mean, and there was a comment wasn't there about, you know, she was trying to lift her legs, but her legs were shackled together, so it's hard to get up into the truck. I mean, I think the district court was looking at this saying, it's not clear, right, that she was noncompliant. And that's my question. The district court said, as a matter of fact, there is a dispute about her noncompliance. How do we have jurisdiction given that, since that is the key factor, it seems to me, or one of them, and the district court says that's a factual dispute? I am glad you asked that because the primary reason we are here, the jurisdiction is because there was no proper analysis performed. That is, under Shannon v. Kohler, they simply failed to follow the law of qualified immunity. The court did not do an individualized analysis. The court did not, I would say, find incorrectly that there was no constitutional violation. The court, in their flawed analysis, they say things like, there's no PC because a disoriented person might not be able to know what they're doing. When, in fact, the case law in this court is, it doesn't matter if the subject knows what they're doing. The noncompliance is what gives the officers the right to use the force. And that's what happened here. Can I ask one? Yeah, absolutely. I'll let you have a little more time. Thank you. So the drive-stunt. I didn't appreciate that difference between the taser and the drive-stunt. And you've heard a lot of questions about it. Is the record undisputed that the drive-stunt? I heard opposing counsel say it as well. The records have disputed that it was a drive-stunt. In fact, it could have been less than a drive-stunt, but I don't have evidence that's undisputed in that regard. But at the very, very most, it was a drive-stunt. It was removing the cartridge, placing the electrodes on what I believe the officer testified, the muscle mass of the thigh. Do we treat those differently in this circuit? Because I'm not a taser expert. Dan, do you have a case study for that? The case law is that a drive-stunt is less of the use of force because it is not incapacitating. And that case, I'm going to go as fast as I can to try to find it. But that case is that because the less force, it is merely a pain technique in order to gain compliance. And so that is why the drive-stunt is treated as less of a use of force, a lower use of force than the full tasing, which is incapacitating. Do we use the word de minimis? Do we use the word de minimis in our cases to describe it? I did not see the word de minimis, Judge Strauss. And thank you very much, Your Honor. And we urge that you reverse the court below, both in the federal and state law claims. Thank you. The case is submitted, and the court will issue an opinion in due course.